Is there a request to divide time? Do I understand that? Yes, Your Honor. I represent the City of Mt. Vernon. I'll be speaking first on behalf of the appellee. Divide the time approximately 10 minutes each. Okay. That's great. We just wanted to make sure. Okay. The first case on the docket is 514-0428, Mark Harris v. City of Mt. Vernon, et al. Attorney for the appellant, Mr.? Thomas Duda. Duda? Okay. I'm sorry. I couldn't read the writing. Oh. My apologies. My fault. I should get more used to that. You may proceed when you're ready. I'm ready. May it please the court? Counsel, my name is Thomas Duda. I represent the plaintiff in this case. This is a case involving administrative review of an adverse decision by the Mt. Vernon Firefighters' Pension Fund denying a line-of-duty disability application for Mr. Harris. The decision of the board is quite short, quite narrow, and really only covers one aspect of the case. I've quoted it twice in my briefs, and basically the Pension Fund found that Firefighter Harris was not disabled. What they found was that the hearing loss impairment that led to his inability to perform duties at a fire scene were not caused by noise to which he was exposed during the term of his employment. That was the sole decision of the Pension Fund, and no alternative basis was provided in their decision. The interesting thing is that when you read the pension board's brief, most of their argument addresses an issue that I'm going to address at the end of my argument, but it was nowhere to be found in their decision. The question of standard review comes up. I would say that the most generous standard would be clearly erroneous. Under the Wilford case, it could be de novo given the fact that all medical testimony was provided by report. There was no live medical testimony in the record. This court is as able to read medical reports as is any pension fund. But the point is, contrary to the statement contained in the City of Mount Vernon's brief, it is absolutely not true that none of the doctors were able to frame an opinion as to what the cause of Mr. Harris' hearing loss was. Not all of the doctors could frame an opinion, but those who did found that it was related to work. Those that were kind of ambivalent did say that it could be noise-induced, didn't they? Even the ambivalent medical reports? Yes. Reference noise-induced? Yes, because you actually, if you look at the reports, this all started with Dr. Neal in an annual examination who told the applicant, you know, you can't hear me, you're a danger to the department, you should apply for disability. He then wrote a slip that he shouldn't appear in fire scenes. He did not state in writing what the cause of the hearing loss was. The strongest opinion is Board Exhibit 3, which is Dr. Carl Lee. Dr. Lee analyzed in detail possible ideological sources, genetics, personal activities, and his opinion was really unequivocal. His opinion was that his firefighting duties either contributed to or were the sole cause of his hearing loss. That's Board Exhibit 3. Board Exhibit 4 is Dr. Berkowitz, who introduces his report by saying that this apparently is a noise-induced hearing loss caused by noise at work. He then goes on to talk about the need for the use of hearing aids to augment the hearing of the firefighter. The third opinion is Dr. Shah. Of the three doctors who examined the applicant for the pension board, Dr. Shah was the third, and Dr. Shah unequivocally said, I cannot, based on my examination or the evidence provided to me, form any opinion. So it's not as though Dr. Shah says there's an alternate cause of this hearing loss. He says, I have no opinion. The interesting thing is when you read Dr. Neal's records and you see the three opinions of the doctors picked by the board, no one talks about motorcycles or rock concerts or hobbies or age. All of the reasons that the board relied on him for denying disability are not found anywhere in this record at any time. The fifth opinion is Dr. Papryzian. Dr. Papryzian was selected by Dr. Neal in his capacity as the occupational physician to get a second opinion, and Dr. Papryzian's somewhat succinct opinion is that this is a noise-induced hearing loss. I'm sorry, this is a hearing loss most likely noise-induced, or this is a noise-induced hearing loss most likely related to his employment. And that's applicant exhibit two. Counsel, you mentioned, just made the oral argument, and I think in your brief said that this idea of motorcycle riding, shooting guns, aging was not found in the record. But wasn't, didn't that come up on cross-examination, Mr. Harris? He did all those. Absolutely. So there is something in the record that he participated in these activities? He did those things, but there's nothing that connects those things with his hearing loss. And I don't think you can take judicial notice of it. I don't think that motorcycle riding, although I have read, I've done a lot of hearing loss cases, I'm familiar with the possibility of the decibel output of motorcycles. But I've never seen a case where somebody's motorcycle riding in and of itself without some direct medical connection has been the basis of denying a claim. And did any of the doctors refer to aging or a genetic factor? Dr. Lee. And Dr. Lee ruled out the genetic factor, and he didn't follow up on the aging. That's board exhibit three. In terms of the genetics, he says that a cause of hearing loss can be genetic, but there's no, he said there's no history of that provided in the patient or the medical records he reviewed. So, counsel, they provided him another job? They did. And is he still doing that job? He is. That's true. Before I address that issue, though, the one comment that the city made that I found somewhat distressing was that the applicant is not disabled because his hearing loss is correctable with hearing aids. And therefore, he's not disabled, and that his vanity was the reason that he chose, it's almost like he voluntarily chose to be disabled. And the record I quoted in my reply brief extensively, the fire chief talked to Dr. Neal, their occupational medicine doctor, asking about the feasibility of using hearing aids for this particular firefighter in this particular instance. And Dr. Neal said it would be too dangerous because the heat could cause the hearing aid to melt, and if the battery failed when he was in the middle of a fire, he would present a threat or a danger. So the reason that the augmentation of the noise levels is not a solution for plaintiff heritance is because at a fire scene, a hearing aid was not determined by the occupational physician to be a feasible remedy. How about in his part-time job, would the hearing aid be- He doesn't use a hearing aid. His part-time job is a test job. But would the hearing aid be a good augmentation under those circumstances? He could use a hearing aid if he did anything other than fight fires and go on emergency calls. But it's your position, I'm sorry, it's your position that this secondary job was made up for him. Well, my position is twofold. My position is, number one, that that wasn't the basis of the decision. Number two, not only was it not the basis, the pension fund made no findings. They made no findings of fact. They made no conclusions of law. Other than in their brief, the pension fund, the pension board, didn't talk about the alternate employment at all. In its order. In its order. But that's what this court's reviewing, the court's reviewing its order. However, since the justice asked the question, I do have an answer. The first, and I'm giving my answer, what standard will the three justices apply in listening to my argument? You have no findings of fact to defer to, so manifest weight clearly would not apply. You have no conclusions of law or mixed facts and conclusions of law, so clearly erroneous wouldn't apply. If this court reviews this at all, it would be de novo. And the basis of my argument is, in the history of the department, from all of the witnesses, in the city of Mount Vernon, light duty has been available for a maximum period of 12 months. We had, in part, I had a co-worker testify to establish the noise levels produced by the various equipment that was used. But he himself had a back injury correctable by surgery. He didn't, he chose not to correct it. He was on light duty for a year and then was granted disability benefits. And he testified that that was the rule. Light duty is available for 12 months. There is no question the chief testified that this is the first time in his entire career in the city of Mount Vernon that a permanent light duty position has been created. He testified he created it, and he created it in order to avoid Mr. Harris being eligible for disability. He said that. I quoted, at the end of my reply brief, I quoted his testimony. So. So what's wrong with that? What's wrong with that is that the appellate court, the appellate court says you can't create a claim just to defeat disability. If you have light duty, if you have an ongoing light duty program. In other words, if the city of Mount Vernon routinely had said, if we have light duty and you can do the light duty, it's indefinite that the cases cited by the defendants would apply. But you can't, you can't for one case pick and choose and discriminate. Why with Firefighter Jones did they not create light duty, but for Firefighter Harris they did create light duty? And when this court sees cases down the road, which cases is light duty going to be created for and which isn't it? So when you start light duty though, at some point they want to start it. So let's suppose the next firefighter comes along, there's a light duty position. Then are we okay? Then is the city okay? If the city, if the city adopts a formal policy that the permanent light duty is available. And it doesn't violate the terms of any collective bargaining agreement, they'd be okay. But I don't think they can do it just to defeat a specific claim. And I believe Kazuka, it's hard for me to pronounce, Kazuzakis. I really think that's, that's what the Supreme Court was getting at. And in Kazuzakis, the city of Chicago indeed had for the police department an ongoing light duty program. In order to avoid putting their police officers on pension. And in this instance, they found that this police officer wasn't made officially available to her. But I'm saying in this case that the rule has been light duty is maximum 12 months. They're discriminating, they've treated Mr. Harris differently than they've treated other firefighters. If you ask me why would they do this to Captain Harris and not the others, I have no answer to that. In that case, counsel, in the Kazuzakis case, didn't the Supreme Court say the standard was clearly erroneous? That it was a mixed question of law? They did, they did, but there were findings in that case dealing with, dealing with the issue of light duty. So how is this different? How is this not a mixed question? The board made no findings on this issue. The court can't defer to something that doesn't exist. You can't write into the decision something that wasn't there in the first place and then give deference to it. In my opinion, if this court's going to look at it, and I did cite the court a couple of cases where they've actually refused to hear it. I'm not sure that's what this court's going to do. But if this court is going to consider that argument, it's a de novo consideration. And light duty in the fire department is somewhat more complex than some of the questions that are asked. I do a lot of fire departments and there are light duty, there are some departments that have no light duty under any circumstances. There are some departments that have limited light duty. But there are a few departments that have a permanent light duty situation. The main reason is, if you can't suppress fires, why are we paying you $80,000? Why are we paying you $80,000 a year to sit at a desk? And if you're at a fire scene and you're only capable of light duty, you're a danger. It's not like other, even police is easier to accommodate than fire. So I do think there's a downside to giving carte blanche on this light duty issue. And there was no medical testimony explaining the reports or explaining how you get bilateral hearing loss? Because a neurosensory loss is very distinct on an audiogram from other kinds of hearing loss. If you look at this, if you look at Mr. Harris's audiograms, they show the distinct worker's notch where they, at 1,000 seconds per second, his threshold of hearing is between 35 and 40 decibels, which is abnormal. When he hits 2,000, this threshold of hearing in both ears is 80 decibels. And when you get up to 4,000, he gets better. So you have that traditional notch. And he's got that. Is that in the record? It is. These are clearly sensorineural hearing loss. Okay. And then did anyone explain that notch at the hearing? No. Then other than the opinions that they wrote. So we're limited just to what those words say, which are not very lengthy. Again, I'm always reluctant to challenge a judge. But, Your Honor, I think Dr. Lee's opinion is as definite as any medical opinion I read. In my opinion, Lee is as good as it gets. And there was no rebuttal to that? There was no what? Nobody contradicted that? Absolutely. Right. Okay. Not all of us have reviewed the record yet. We don't have it. No, that's fine. But I do agree that Dr. Papryzian's statement on causation is somewhat glib. But I thought Dr. Lee's analysis was pretty detailed. And in terms of causation, that's as much as I hope for in any disability or personal injury situation. In any event, how you're going to deal with the light duty is a tough question without any findings and without any conclusions. But it clearly was manufactured strictly for this case. There's no question about that. And we thank you very much for your time and attention. And I know I gave five minutes for rebuttal. Thank you. Thank you very much. Okay. So, Mr. Lightings? Yes. As I indicated earlier, I represent the city of Mount Vernon. May I please report in counsel? Under the Administrative Review Act, the scope of review of this court extends to all questions of law and fact presented by the record. And the scope of review is not limited to a specific factual finding made by the administrative board during the review. Having said that, I'd like to briefly address the appellant's argument challenging the factual findings of the board. With regard to that, counsel has cited two cases, which he mentioned briefly, the Medina case and the Reinhart case. And we maintain those cases are factually inopposite. In each of those cases, the administrative body making the decision relied upon a report from a third person. In one case, it was the school superintendent. And in the other case, it was the Department of Public Health. Then when the board made this decision, it failed to adopt the findings of either report. So, in essence, there was no factual findings for the court to review. In this case, the pension board conducted its own hearing, and the board did not rely on the report of any third person in terms of the hearing arms. However, even if this board… Did you say the board did not rely on it? Did not rely on the report of an investigative body. It did, in fact, rely on doctorate reports, but that was during the course of its own hearing. But even if the court were to accept the argument that the factual findings of this board or the pension board is insufficient, the relief that this court should grant is not reversal of the decision. The relief of the two cases that counsel cites is that the case was remanded to the pension board to make sufficient factual findings so the court could review the factual findings of the board. The cases certainly do not hold that it changes the level of review to de novo. The substance of this case… You agree, then, that the board had an obligation to make findings of fact and conclusions. I certainly agree with that. And you agree that those are absent. I would agree that the factual findings are very scant. Now that's fair. And it's a matter of whether you want to say that they have no findings, scant findings, or a great deal of findings. They do not have a great deal of findings. I appreciate that point. The substance of this case has two issues. One issue is whether work-related incidents caused Mr. Harris's hearing loss. And then the second issue is whether Mr. Harris was disabled within the meaning of the pension code. I'm going to address the second issue first because that issue actually trumps the causation issue. And would our standard of review on that second issue be de novo? On the second issue? Yes. No, the standard of review on that is clearly wrong. It involves a question of fact and logic, as counsel indicated. And I'll whistle and let you tell me why that's so. Okay. Okay. If I may proceed with my argument, I will get to your point. The reason that the second issue trumps the causation issue, and we don't get into all the arguments that counsel just made, is because Mr. Harris's hearing loss, regardless of its cause, did not prevent him from performing duties within the fire service. The question of whether Mr. Harris is disabled within the meaning of the pension code under the case law constitutes a question both of law and fact and, therefore, is subject to the erroneous standard. The important thing to remember in this case, though, is essentially no factual dispute that Mr. Harris was performing the duties of fire inspector without complaint, without difficulty, at the time of the hearing of the pension board. And, in fact, as counsel indicated, to this day. So the disagreement of the parties on this issue is actually a disagreement on a question of law. And the dispute on the issues relates to a line of cases, which begin with the Supreme Court case, Peterson v. Board of Trustees of Fireman Pensions Fund of City of Des Plaines, which all the parties have cited. And that case basically held that so long as an applicant can perform duties of a position within the fire service, the applicant does not meet the definition of disability under the pension statute and is not entitled to a disability pension. And that's the case that basically set the standard of review, the more strict standard of clearly erroneous instead of manifest right. The city submits that this case comes within the reasoning of that case and the subsequent cases that relied on it. Appellant argues and cites cases where the court refused to apply this rule. And I will admit there are a couple of cases where the court did not apply the rule. An appellant argued that the court didn't apply the rule because it was a, quote, newly created position. You can't have a newly created position. But in the cases that appellant cites and argues, what the court found is that the light duty position created for the applicant was either not offered to the applicant or the light duty position did not in fact accommodate the physical limitations of the applicant, so the applicant could not perform the duties. That's what those cases hold, not that you can't create a new position. Basically, a plain reading of those cases is if an employer is going to transfer an employee into a new position to perform duties within the fire service because of physical limitations, the individual that you're transferring has to have the ability to perform the duties of the position. If the applicant can perform those duties, notwithstanding his limitations, then he does not meet the definition of disabled under the pension code. Now, if he can't perform those duties, then he is disabled and he is entitled to a pension. In this case, it is undisputed that Mr. Harris can perform the duties of the position of fire inspector. That was a position that he was offered. That was a position that he accepted, and it was a position that accommodated his hearing loss. Was the pay similar? He suffered no. No pay. No definite benefits or pay. I don't see any arguments in here about the collective bargaining agreement. Did this position fall within or is there one? Well, the issue did not come up during the hearing, but the fact of the matter is the fire inspector position is a longstanding permanent position within the department. What happened in this case was not that the city of Mount Vernon created a fire inspector position and put Mr. Harris into it. The city transferred Mr. Harris from the captain's position into the longstanding fire inspector position, which he had, by the way, occupied for a total of six years during his prior service. All the city did was accommodate his limitation. They did not require him to wear a hearing aid, and they did not require him to attend fire or emergency scenes. So it wasn't a creation of a light-duty position. It was an accommodation within an existing position. But, B, whether it's either one, the cases don't prevent either one. Now, I guess on that issue, obviously the only way an employer can fashion a position for an employee to meet limitations is after you learn those limitations. The city was in a position in this case to accommodate him within the position he had previously held fire inspector, and that's all that happened in this. There was no ill will. With regard to the second issue, and I'll be very brief on that, quite frankly, as I indicated, the issue on whether he meets the definition of the disability and pension code trumps the causation issue, because it doesn't really matter whether his hearing loss arose from duty or non-duty issues. If he can perform duties in the fire service, he's not disabled. So he would be eligible for a non-duty warranty related, in my view, under the cases. And so I've given the limit to time. I'll not address the causation issue further. Thank you. Thank you very much. Ms. Seitz? Am I pronouncing that correctly? Seitz. And you representing the? Yes, Your Honor. My name is Esther Seitz, and I represent the city of Mount Vernon Firefighters Pension Fund. That is the board, as it's sometimes referred to. May I please have the court? There's obviously two issues that have been identified by my colleagues, and one is the disability issue. The question is, was Mr. Harris disabled from service in the fire department? And that language appears in the pension code. There has to be a showing, and the burden of proof is, one, the applicant, that he was disabled for service in the fire department. The statute does not talk about being disabled from fighting fires, but rather, he's no longer able to serve in the fire department. Now, that's the statutory text, and that is the first thing that I urge this court to consult in reviewing the decision of the board. Now, here, Mr. Harris was not disabled from service in the fire department because the evidence shows that he was able to work in the fire department. Now, not as a firefighter, as he had for some years, but rather as a fire inspector, as he had for some years prior, and then was moved back into in order to accommodate his more recent hearing loss. Now, that fire inspector position was one that he was able to, it was a position that was offered to him, and that's important because a lot of the cases, in the Kazuka's case, the position had not really been offered. There was nothing in the record that the applicant could actually perform capably in a position that was in the department, and that position was offered to him. So, here, Mr. Harris was offered a position. He was able to perform in that position to the fire chief's satisfaction, and his hearing loss, Mr. Harris' hearing loss, did not interfere with his performance in that position because that position did not require him to go to fire scenes. It was essentially a desk job, but it was, importantly, a desk job that he had performed for some years in the past. So, because here the record is quite clear that Mr. Harris was capably able to perform in a position in the fire department, that was offered to him at the time of the hearing. This was not a position that, at the time of the hearing, the board urged, oh, we'll make that available for you. No, at the time of the hearing, Mr. Harris was already serving in that position, and he was doing so well. And because of that, he was not disabled from service in the fire department, and that's really where the inquiry ends. I understand that the funds or the board's findings were not on that particular issue, but the court here should give deference to the administrative decision as long as there is some competent evidence in the record. And there's competent evidence in the record here that Mr. Harris served capably in a position that had been offered to him in which he was functioning at the time of the hearing. And because of that, he was not disabled from service in the fire department, and the board, therefore, did not err in denying his line of duty application. So what you're saying is we can go to the end and look at the end result without reviewing how the board got that? It's not really reviewing the end result because the statute says that an applicant is entitled to a disability pension only if there's no job in the fire department, if he's disabled from service in the fire department. The text of the statute. And that's the issue, and I think you could simply answer that question based on the evidence in the record. But the—I'm pretty sure that we're to review the findings and conclusions of the administrative agency. And the—yes, the conclusions of the administrative agencies should be upheld as long as there's some competent evidence in the record. Now, this court could find another reason to uphold. It doesn't have to go down the same analysis as the pension board. Obviously, the pension board based its conclusion on a different path, so to say. It says there was no causation. That is what I identified as the other analysis. And on that issue, on the causation issue, we urge that there is sufficient evidence in the record to affirm it as well. When you say in the record, though, you're talking the appellate record or just the— In the record before the administrative agency, before the board. And in that record, there was evidence of—the medical evidence, documentary evidence only. And then there was the testimonial evidence from Mr. Harris and some former colleagues and also from the fire chief. Now, Mr. Harris, during his hearing, testified that—on the causation issue, the separate analysis. And that would be an independent basis to affirm that he did practice hobbies that were exposing him to loud noises. Now, Mr. Harris's reason for—Mr. Harris here claims that his hearing loss was caused by exposure to loud noises at work. Well, if exposure to loud noises creates a hearing loss, then he was equally exposed to loud noises by his own chosen extracurriculars. And he testified that he has for many years engaged in shotgun hunting, that he agreed produces loud noises. And then he also writes Harley-Davidson motorcycles, which also create loud noises. So there was some evidence for the board to conclude that it was the noise exposure that Harris suffered as part of his hobbies and not the noise exposure at work that left him. Who connected those? I mean, if you shoot a gun once, are you likely to induce a noise-induced hearing loss versus being in the military where you're standing near a cannon that's going off all the time? I don't see where the board had any expert of any kind that tied up the cross-examination. Sure, you can ask, do you have a hobby? Do you have hypertension? You know, whatever. Would you take a certain kind of medication? But does that allow a board to conclude that that hunting experience causes noise-induced loss without an expert to say so? I submit it does, Your Honor, because the expert, the medical expert, says that loud noises can cause a hearing loss. There was evidence of other loud noises that Harris was frequently exposed to. I agree one time he heard a shotgun fired may be not so convincing that that caused a significant hearing loss many years later. But if one practices hunting as a hobby and also, in addition, motorcycling, then yes, the exposure to noises while one practices hobbies can also create a hearing loss. That says who? Is there any medical evidence, is there anything in the record that ties up this hobby evidence medically with causation? No, the medical evidence does not talk about the hobbies. But the medical evidence says that loud noises can, indicates that loud noises can lead to a hearing loss. Now, there's evidence of other loud noises in the record. And therefore, there's competent evidence to support that the hearing loss could have been caused by those loud noises. You don't need a doctor to say that the klaxon alarm is a loud noise and motorcycling or firing a shotgun is a loud noise. I think we all know loud noise is loud, loud noise. And it's all about, and what's also important. It's all about decibel levels, exposure times, frequencies. That's accurate. That requires an expert witness. Well, there was no expert witness on the hobbies. There was no expert before, as the justice just asked. But there certainly is an expert for the noises that were created by firing one. Yes, but the doctors could not definitely say, none of the doctors could definitely say that it was the noise exposure of work that caused the hearing loss. And more importantly, none of the doctors said that Mr. Harris couldn't perform a service in the fire department. None of them said that he couldn't fight fires or that he couldn't work at the desk job, the fire inspector's position. What the medical evidence suggests is that it definitely says there's a hearing loss, but it's inconclusive as to what caused it. In fact, there is some support in the medical evidence that genetic factors, possibly prior ear infections, caused the hearing loss. And the medical evidence also notes the age, indicating that aging has something to do with the hearing loss as well. I'm just bothered by the fact that, with the lack of factual findings, that you're asking us to ignore all of that and say that, well, we've got him in a good job now, and so that's all that you should look at. That concerns me. That's your view of what we should be doing? The reason I'm asking that is because of the statutory text, which talks about disability from the fire department. Thank you very much. Thank you. Mr. Duda? I only have three points to respond to. The question that the court asked was, the fire inspector job, was it covered by a collective bargaining agreement? And I wanted to point out to the court, the fire inspector job is part of a series of written job descriptions. All of the jobs in the fire department were subject to written job descriptions. This position, the captain's position is in the bargaining unit, as is the fire inspector. The written job description during the 23 years that the plaintiff worked for the department required engaging in fire suppression and EMS duties. It was part of the written job description. This court was told that Mr. Harris simply went back to a position he had previously held. Absolutely false. The position he held required fire suppression and EMS duties in writing. That was changed March 22, 2012, and that is found on pages 8 and 9 of my reply brief, 87 to 90 of the record. That the chief testified after the application for disability was filed, he unilaterally altered the written job description. I do believe he submitted it to the city council for approval, and the written job description was changed that fire suppression would no longer be part of the job. So my client absolutely never went back to the original job that he had. He physically could not. Number two, the argument that this court isn't, that somehow there's no connection between the logic and reasoning of the pension fund and your review is not only contrary to the case law, but you have to remember deliberations for this disability application weren't done in open session. They were done in closed session. So whatever personal grudges any of the members of the board had with Mr. Harris, those are clothed in an executive session. The Open Meetings Act says when you go into executive session to deliberate, you have to file a written decision that explains how you reached your conclusion. So the explanation of how they reached their conclusion is not only important under the pension code, it's important under the Open Meetings Act because nobody deliberated in open session. And last but not least, the experts were never provided with any background concerning the applicant's outside activities because nobody knew about them until cross examination. And I just want to close by reading Dr. Lee's opinion on causation. Therefore, I believe that it is likely that noise exposure during the patient's employment has contributed, if not being completely responsible, for his sensorineural hearing loss, period. The suggestion that that is equivocal or that there's no evidence of causation is simply not supported in the record. Thank you again for your time and attention. Thank you, Mr. Lee. Thank you, counsel. This matter will be taken under advisement and an order will be issued in due course. Thank you for your arguments.